HOWLAND (HAZARD v.). See Case No. 6,-280.

---

## Case No. 6,795.

HOWLAND et al. v. The HENRY HOOD.

[2 Betts, D. C. MS. 11.]

District Court, S. D. New York. June 8, 1841.

ACTIONS FOR INJURY TO PERSONAL PROPERTY — COMMON CARRIER—WHEN LIABILITY CEASES.

[Where the consignee of a cargo of bricks came to the vessel and ordered them put on a wharf, the liability of the master as a common carrier ended when they were placed there, and he is not responsible for any injuries not shown to have been received previous to such delivery.]

[This was a libel in rem by Gideon Howland and Gilbert Howland against the bark Henry Hood (William M. Cameron, claimant) for failure to deliver a cargo of brick

under the terms and conditions of a bill of lading.]

BETTS, District Judge. This action is grounded on a bill of lading signed by the claimant on the shipment of a cargo of fire brick at Liverpool, England, in favor of the libellants. The essential averments of the libel are, that the bricks were shipped in good order, and were not delivered here in conformity to the stipulations of the bill of lading, and damages are demanded to the amount of $918, being $15 per thousand, the supposed difference between these bricks in good order and the condition in which they now are. The bricks were purchased by the libellants, by sample, and were sold again by the same sample at $45 per thousand; but it is clearly proved, on the assertion of the libellants themselves and other testimony, that the bricks were intrinsically of an inferior quality and worth less by from $10 to $20 per thousand than the samples. If, then, a case for recovery was established by the libellants, the standard of valuation would be to be placed to that extent lower than is claimed by them. The bricks received injuries, impairing their value to a considerable extent, probably to the amount at least of $10 per thousand, but the evidence is insufficient to show that these injuries were received in their transportation on board the vessel. It is to be assumed upon the bill of lading, in the absence of proof on the part of the master showing the contrary, that the bricks were laden on board in merchantable order. The vessel is accordingly bound to deliver them in like condition (2 Kent, Comm. 207), saving the exceptions in the bill of lading, none of which apply to this case, unless it be in respect to breakage, which will be more particularly noticed hereafter. What, then, is the extent to which the responsibility to deliver is carried? Does it embrace storage on shore (or piling, in this case) or is it satisfied on unloading of the cargo, or at most by placing it on the wharf, there to be taken charge of at the risk of the owner?

The weight of evidence in this case is, that the bricks received their material damage after they were passed from the vessel to the wharf, and in the way they were handled and used in the piling there. Some of the witnesses assert there was great carelessness in landing the bricks, and that they were let fall and otherwise so handled as to subject them to serious injury. The persons most particularly engaged in the business, and whose attention was immediately directed to it, testify that the delivery was made with all reasonable care, and that the injuries occurring in that respect were but trivial, and no other than must necessarily happen in like cases where ordinary prudence and care are employed. If this degree of injury was designated or

could be measured by the proofs, the libellants would undoubtedly be entitled to recover for it, however small, because the liability of the vessel as a common carrier would upon general principles be deemed yet continuing; but the general evidence will not authorize even a reference, because the vessel took on board and landed 1,000 brick more than were specified in the bill of lading, and accordingly, if the court might upon the proofs infer that some 50 or 100 were broken in landing, and five times as many fractured in the corners or otherwise injured, it would not be justified in attaching such injuries to the parcel stipulated to be conveyed, and the vessel must be regarded as having fulfilled her contract under the bill of lading, by landing in good order the number therein specified. No witness estimates the number of brick broken or lost at so great as not to leave full 61,000 in the quantity landed, and therefore the whole controversy must turn upon two considerations: First, whether arranging and securing the bricks in ranks and piles on the dock is part of the delivery, and over which the responsibility of the vessel continues to the same degree as for their carriage; or, second, if the delivery is not complete, so far as the liability of the vessel is concerned, by passing the bricks to the wharf or shore, then, whether it is established upon the evidence that the libellants had assumed upon themselves the risk of the delivery in the particular manner in which it was made.

The rule of law seems well settled, when vessels are loaded or discharged in public docks or places where wharfingers or warehousemen have charge of the cargo whilst it is not in the vessel, that the responsibility of the vessel ends when theirs begins, and, vice versa, commences when theirs terminates. Avery v. Fox [Case No. 674; 5 Durn. & E. [5 Term R.] 397; 4 Durn. & E. [4 Term R.] 581; 8 Cow. 223. Any peculiar usage or custom of the port will also determine the sufficiency of a delivery unless specific directions are given the master requiring a different one. Avery v. Fox [supra]; Holt, Shipp. pt. 3, c. 3, § 30. This port being governed by no specific law in this respect, and no custom or usage being shown, the rule of the common law applicable to common carriers governs the delivery. 2 Kent, Comm. 605, note. A common carrier is ordinarily held responsible for the goods until put in possession of the party to whom they were to be delivered. But this possession need not be actual or positive. It may be constructive or implied. Accordingly it has been contended by great weight of argument that a delivery of goods on the usual wharf by a ship trading from one port to another discharges the carrier. 5 Durn. & E. [5 Term R.] 389. But this is at least made doubtful by later authorities, as their bearing seems to indicate that unless

there is some custom of trade or some contract or direction to the contrary governing the particular case, that the liability of the carrier continues until an actual delivery of the goods. Story, Bailm. 346; 2 Kent. Comm. 625. It would seem important that a point so material to the conveniency of foreign trade and navigation should be definitely settled. The adjudications heretofore rendered in England and this country (Story, Bailm. 346, 347; 2 Kent, Comm. 604, 605) have rested upon special classes of facts without the occasion yet occurring calling from the courts a declaration of the rule applicable to a vessel having on board goods from a foreign port, when the consignee fails or refuses to point out the mode of delivery. I am persuaded that when the doctrine is fully considered it will be determined that the spirit of this species of contract is that the carrier would then be only bound to convey the goods safely to the port of delivery and to pass them from his vessel when demanded, and that the bailor must take charge of their ulterior disposition, either by his agent or by directions to the master, who will in executing them act as an agent or factor, and not under the responsibility of a common carrier. The character of common carrier in principle continues from the place of departure to the place of destination, and covers the transportation merely. The cases are not now analyzed to ascertain whether their fair bearing does not support this doctrine, because the facts brought out in this case do not demand of the court an adjudication upon this point. Many of the English and American cases throw light on the subject, yet without defining with exactness and precision the responsibility of the ship or owner after the transit is ended. The more recent English cases would rather import that the shipowner was to be placed on the same scale of responsibility with the carrier by land in trucks, wagons and coaches, and do not seem to allow weight to the distinction, so forcibly noticed by Mr. Justice Buller, that the ship has not the means of carrying goods on land, so as to deposit them personally with the party to whom they are directed. 3 Durn. & E. [3 Term R.] 389. And the new method of interior transportation by railroads, must necessarily attach to the great proportion of land carriage the same difficulty of actual delivery. The necessities of business will soon exact from the courts or legislatures a rule upon this head that shall be clear, positive, and in conformity with the conveniences of trade. That rule may probably be deduced from the principles already adjudicated or discussed in the later cases. 2 Moore, 500; 4 Bing. 476; 15 Johns. 39; 4 Pick. 374; 1 Rawle, 203; 3 Dana, 92; 6 Cow. 767; 8 Cow. 223; 14 Wend. 216; 21 Wend. 189. At least it will be found authoritatively declared that a delivery conformable to the directions of the owner or consignee will be a discharge of the carrier, whether the goods are actually received by the proper party or not. Avery v. Fox [supra]; 8 Cow. 223.

The testimony here shows that the libellants came personally to the vessel, and first ordered the brick delivered on board a boat or lighter, and directed the stevedore, if the lighter was not alongside to receive them, to land them on the wharf, and added "he might hustle out the bricks as quick as he pleased." The libellants also made a contract with the stevedore to pile up the bricks after they were landed, and the proof is clear that, the men not being able to arrange the ranks as fast as the bricks were passed out, they were thrown down promiscuously in a heap within the enclosure prepared for that purpose, and that the libellants saw the mode in which the business was done, and expressed to the stevedore their satisfaction with the manner in which he conducted it. I hold, then, upon this evidence that the liability of the master as common carrier ceased when the bricks were landed upon the dock, and that there is no proof that the injuries complained of were received previous to such delivery. The injury consists in the clippings and breakings of the edges of the brick. The manner of handling them by the stevedore, under the special employment and instruction of the libellants would be much more likely to cause that injury than the passing them from the hold and across the deck of the vessel, from hand to hand, by men stationed a few feet apart. Without, however, deciding the cause upon the relative weight of these probabilities, it is sufficient to say, that the libellants fail to prove that the bricks received the injuries complained of previous to their delivery. I do not proceed upon the special terms of the bill of lading, which exonerates the master from accountability for breakage, because, in my opinion, if that does not embrace the clippings and breaks of edges, which the bricks received, yet, for the reasons already assigned, the libellant cannot recover therefor, upon the proofs he has given. Decree that bill be dismissed, with costs.